UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No. 8:17-CR-471-VMC-SPF

GREGORY GADDIS
_____/

## ORDER

Defendant Gregory Gaddis was arrested after the United States Probation Office notified the Court that Gaddis had absconded from supervision. (Docs. 93, 98).  Gaddis suffers from a diagnosed delusional disorder, grandiose type.  (Doc. S-155).  His delusions center around his strongly held belief that the "criminal section of the establishment," an evil cabal, is engaged in child exploitation. During the course of the criminal proceedings against Gaddis, his delusional disorder rendered him incompetent to proceed for lengthy periods of time, followed by brief instances where Gaddis' competency was restored. Since his last hospitalization, Gaddis' mental status has drastically deteriorated such that the Court finds by a preponderance of the evidence that Gaddis is presently suffering from a mental disease or defect rendering him mentally incompetent to proceed. 18 U.S.C. § 4241(d).

## PROCEDURAL HISTORY AND FINDINGS OF FACT

In September 2017, Gaddis was indicted on two counts of interstate transmission of a threat to kidnap or injure. (Doc. 1).  As Gaddis would later admit in a written plea agreement:

Between September 18, 2017, and September 20, 2017, [Gaddis] used a landline telephone located in Atlanta, Georgia to call Publix Super Markets, Inc. ("Publix"), in Lakeland, Florida, multiple times.

If a call was answered by a Publix employee, [Gaddis] would identify himself by his name and Publix employee identification number. On numerous calls, [Gaddis] demanded that Publix give him $15,000.

In particular, [Gaddis] explained, on a September 20, 2017 telephone call that he made from Atlanta, Georgia to Publix in Lakeland, Florida, that he represented an anti-establishment organization made up of "real killers," "trained killers," and "straight up killers." He said that if Publix did not give him $15,000, he would report it to the group who would then "deal with it." He said the group had drugged people, "snatch[ed]" people up, anally raped people, and killed people. He suggested that the group could do any of those things to Publix employee, R.T.J.

When a Publix security officer explained that [Gaddis] was making the officer believe that the group would hurt R.T.J., [Gaddis] responded, "and they will. That's what I'm telling you. It's not if they will, they will.["] When the public [sic] security officer again stated that the group appeared to be threatening R.T.J., [Gaddis] replied, "no, they're not threatening, they will come do something to him. I promise you. They will do it. . . . If they snatch him up and kill him, nobody would ever know . . . And that's probably what they could do. . . . These folks are trained killers, basically."

[Gaddis] made these statements for the purpose of issuing a threat and with knowledge that the communication would be viewed as a threat. Likewise, the communication was reasonably viewed by Publix and its participating employees as a true threat to injure or kidnap R.T.J.

(Doc.73 at 14-16).

During the course of representing Gaddis, his court-appointed attorney "developed serious concerns regarding the mental health and competency" of Gaddis. (Doc. S-22). Based on these concerns, Gaddis' counsel retained the services of forensic psychiatrist, Dr. Jeffery Danzinger, M.D., to conduct a competency evaluation. (*Id.*). After examining

Gaddis, Dr. Danzinger opined that Gaddis suffered from a delusional disorder, grandiose type and was not competent to proceed.  (*Id.*).

On February 12, 2018, following a motion by defense counsel, the Court ordered Gaddis hospitalized for competency restoration.  (Doc. 28).  On September 9, 2018, the Mental Health Department of the Federal Medical Center in Butner, North Carolina ("Butner"), issued a sealed report (Doc. S-40) indicating that Gaddis was not competent to stand trial and was refusing to accept the medication necessary to render him competent.  In the report, Butner acknowledged that, pursuant to *Sell v. United States*, 539 U.S. 166 (2003), it could not medicate Gaddis without his consent, unless the Court first determined that the four prerequisites outlined in *Sell* had been met.  The United States proposed that the Court start by determining whether the first *Sell* prerequisite—important governmental interests—existed in this case.  After conducting a hearing on October 29, 2018, the Court made such a finding. (Doc. 52).  After further evaluation, a staff psychiatrist at Butner opined, "with reasonable medical certainty, involuntary medications are substantially likely to render Mr. Gaddis competent to stand trial." (Doc. S-56).

Prior to conducting a second *Sell* hearing, Gaddis' counsel had him evaluated by Dr. C. Robert Cloninger, who opined that Gaddis was competent to proceed and not in need of psychotropic medication to restore him to competency.  (Doc. S-65-1).  Dr. Cloninger noted marked improvement in Gaddis' rational understanding.  According to Dr. Cloninger, Gaddis expressed no delusional thinking about his defense counsel and reported that he felt able to work with counsel in preparing his defense.  (*Id.*).  Dr.

3

Cloninger opined that Defendant can "assist his defense counsel effectively in preparing his defense and trying to reach a plea agreement in a reasonable way." (*Id.*). At a competency hearing held on April 17, 2019, the parties stipulated to Dr. Cloninger's report and findings as evidence of Gaddis' competence. (Doc. 69).

In May 2019, Gaddis pled guilty to Count Two of the Indictment. (Docs. 73, 80). As recommended by all parties, Gaddis was sentenced to 60 months' probation, subject to certain conditions. (Doc. 89, 90). Less than three weeks after his sentencing, however, the United States Probation Office reported that Gaddis had absconded from supervision. A warrant was issued, and Gaddis was arrested in Atlanta, Georgia on October 21, 2019. (Doc. 98).

On May 18, 2020, during an attorney/client meeting, it became apparent to Gaddis' court-appointed attorney that Gaddis' delusions were now affecting his ability to assist counsel in his defense and to make rational decisions regarding the case. (Doc. S-130). Consequently, Gaddis' attorney moved for a competency examination and hearing. (*Id.*). On May 26, 2020, the Court found there to be reasonable grounds to believe that Gaddis may presently suffer from a mental disease or defect rendering him mentally incompetent to proceed. (Doc. 133). The Court appointed Valerie McClain, Psy.D., to conduct an independent psychiatric examination of Gaddis.

Following the psychiatric examination on July 9, 2020, Dr. McClain filed her Forensic Psychological Evaluation. (Doc. 143-1). Dr. McClain concluded that Gaddis was not competent to proceed based on her findings that Gaddis was unable to: (1) understand the adversarial nature of the legal process; (2) disclose to his attorney pertinent

4

facts; and (3) testify relevantly.  (*Id.*).  Dr. McClain diagnosed Gaddis with a delusional disorder (grandiose and persecutory type) along with major depression (recurrent) and an alcohol use disorder.  (*Id.*).  In Dr. McClain's opinion, Gaddis was not restorable. (*Id.*). As a result, Dr. McClain recommended "[p]lacement in a structured, supervised psychiatric setting with 24 hour supervision to assist him with his basic care and continued medication management."  (*Id.*).

Thereafter, the Court conducted a hearing on July 22, 2020, to determine the mental competency of Gaddis. 18 U.S.C. §§ 4241(c) and 4247(d).  Based on the Court's independent review of Dr. McClain's Forensic Psychological Evaluation and the Court's own observations at the hearing, the Court found by a preponderance of the evidence that Gaddis was presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to assist properly in his defense. 18 U.S.C. § 4241(d). (Doc. 148).  Gaddis indicated that he believed the court system is part of the "criminal section of the establishment" and must be stopped.  (*Id.*).  He further stated that his attorney was part of the same criminal section of the establishment and is working with the prosecutor against him.  (*Id.*).  While Gaddis indicated that he believed there were attorneys who are not part of the criminal section of the establishment, he declined to identify any acceptable attorney. (*Id.*).  Accordingly, Gaddis was committed to Butner to determine whether there was a substantial probability that in the foreseeable future he would attain the capacity to permit the proceedings to go forward. (*Id.*).

Upon his arrival at Butner, Gaddis warned the staff that he "d[id] not like child molesters and [he] could very well kill one while there if they are not kept away from

[him]." (Doc. S-155).  As a result, Gaddis was deemed by Butner to be "appropriate for placement in medical isolation alone." (*Id.*).  Gaddis remained "in a secure setting for the entirety of the hospitalization period, undergoing an investigation into his threats and risk of violence in the institution setting." (*Id.*).  Gaddis ultimately received an incident report for "Threatening Bodily Harm." (*Id.*).  Despite Gaddis' threat of violence necessitating his isolation for the duration of his hospitalization, the Risk Assessment Panel at Butner inexplicably, and without elaboration, found that Gaddis did not meet the criteria for civil commitment and therefore "a certificate of dangerousness would NOT be filed." (*Id.*).

As to competency, Dr. Evan Du Bois, a forensic psychologist at Butner, opined that Gaddis was "not currently suffering from a mental disease or defect which renders him incompetent to stand trial." (*Id.*).  Dr. Du Bois noted that while Gaddis was initially "dismissive of the assistance of his current defense counsel," he later was "able to set aside these concerns and proceed in his case." (*Id.*).  Specifically, "when asked if he would proceed with his current defense counsel if no other such attorneys [from his organization] presented, he adamantly stated he could." (*Id.*).  Dr. Du Bois acknowledged that there are "fluctuations" in Gaddis' overall presentation, including periods where he is focused on his delusional beliefs, but those periods were not observed during his hospitalization. (*Id.*).

After his hospitalization at Butner concluded, the Court held a competency hearing on June 22, 2021. (Doc. 158).  During that hearing, Gaddis was adamant that he would not work with his court-appointed attorney.  Gaddis accused his attorney of being a pedophile and stated that his attorney "shares the views of destroying the life, welfare, and

6

safety of children and other people." Gaddis further stated that his attorney was part of the criminal section of the establishment, which are members of society Gaddis believes are actively committing criminal acts against society. Gaddis explained that the "establishment must be removed from the top of the hierarchy of our organizations . . . Our criminal justice system, our legislative bodies, our government bodies, our military, businesses, sports institutions, schools, universities, [and] churches are being run by criminals— the criminal element of the establishment." With respect to attorneys, Gaddis claimed that "just about all of them, 100%," are members of the criminal element of the establishment and he is not willing to work with any court-appointed attorney. Given Gaddis' strongly held delusions about his court-appointed attorney,[1] the Court found that the interests of justice required the substitution of counsel. 18 U.S.C. § 3006A(c) ("The United States magistrate judge or the court may, in the interests of justice, substitute one appointed counsel for another at any stage of the proceedings."). While Gaddis stated that all members of The Florida Bar are part of the criminal section of the establishment, the Court identified a CJA attorney who has served as guardian *ad litem* to protect the interests of children. The Court was hopeful that upon learning of their common interest in protecting children, Gaddis would be willing to assist his new counsel with his defense.

---

[1] Gaddis' delusions at the hearing extended beyond his court-appointed attorney. Gaddis claimed to have "traced some phone calls with the [district judge] and Publix. She is still in contact with Publix," which Gaddis described as the "original plaintiff in this case" and the "most evil company ever." According to Gaddis, Publix told the district judge that she has "got to keep this guy locked-up—he has stuff on us."

Unfortunately, Gaddis' delusions could not be overcome. Gaddis refused to meet with his new attorney and refused to even attend his competency hearing on August 31, 2021. (Doc. 170). Dr. Du Bois testified[2] that Gaddis, upon his arrival at Butner, warned: "I do not like child molesters. I could very well kill one while [at Butner] if they are not kept away from me." (*Id.*). But this was not an isolated incident. Dr. Du Bois testified that "many" or "several" times Gaddis either directly stated or intimated some sort of hostility towards people he perceived were sex offenders. (*Id.*). Dr. Du Bois also revealed that Gaddis had been involved in some "physical altercations" during his previous stay at Butner. (*Id.*). During a threat assessment interview, Gaddis threatened that he would harm sex offenders if he were to come out of his cell. (*Id.*). Consequently, Gaddis was "placed in a cell by himself in order to keep him away from anybody who he could perceive was a sex offender or, you know, that he could act violently towards." (*Id.*).

Despite Gaddis' history of threats and violence while at Butner, Dr. Du Bois testified that Gaddis was evaluated for civil commitment pursuant to 18 U.S.C. § 4246, but it was decided that a certificate of dangerousness would not be filed. (*Id.*). In the Court's opinion, Dr. Du Bois struggled to explain the rationale for the decision. (*Id.*). Dr. Du Bois acknowledged that it was not an easy assessment given Gaddis' history of violence and threats made while at Butner. (*Id.*). But Dr. Du Bois was of the belief that Gaddis had no intention of harming others outside of the Butner institution. (*Id.*). Dr.

---

[2] With his counsel's consent, the Court proceeded with Dr. Du Bois' testimony without Gaddis present.

Du Bois stated that Gaddis "only talked about that violent ideation toward sex offenders inside this . . . prison." (*Id.*).

With respect to his competency, Dr. Du Bois explained Gaddis' delusional disorder and his irrational belief system. (*Id.*). According to Dr. Du Bois, however, Gaddis' delusions did not seem to interfere with his understanding of the factual basis of the allegations against him. (*Id.*). Dr. Du Bois admitted that part of the reason Gaddis was found competent while at Butner was his willingness to work with his court-appointed attorney. (*Id.*). Dr. Du Bois testified that Gaddis' current belief that all court-appointed attorneys were pedophiles would impact this assessment. (*Id.*). As Dr. Du Bois stated: "If [Gaddis] couldn't work with any lawyer based on that belief, obviously there would be the assumption that there is no other group that's coming forward, then I think he would have difficulty [assisting in his own defense] as, you know, it's clear today that he wouldn't even come to the hearing." (*Id.*).

When asked whether he believed Gaddis was competent and able to make a knowing waiver of his right to represented by counsel, Dr. Du Bois candidly answered, "I don't know." (*Id.*). When pressed further, Dr. Du Bois agreed that Gaddis would not be competent to waive his right to counsel if it was based on his delusional belief that court-appointed attorneys are part of the criminal element of the establishment. (*Id.*).

Dr. Du Bois indicated that it is unlikely that Gaddis' competency could be restored in the foreseeable future. (*Id.*). Dr. Du Bois further testified that he could not state with a reasonable degree of medical certainty whether Gaddis would benefit from any specific

medication.  (*Id.*).  As a general proposition, however, Dr. Du Bois does believe that antipsychotic medication would benefit individuals with delusion disorders.  (*Id.*).

After taking the matter under advisement, the Court held a status hearing to determine whether the United States intended to proceed with the violation and whether it sought the involuntary administration of medication in order to restore Gaddis' competency.  (Doc. 173).  Due to the apparent decline in Gaddis' mental health and the lengthy period since his last evaluation, the United States moved for further evaluation of Gaddis under 18 U.S.C. §4241(b), and a determination by the Court whether Gaddis is competent to proceed to a final revocation hearing.  (Doc. 175).

At the subsequent hearing held on May 26, 2022, it appeared that Gaddis' mental health had further deteriorated.  (Doc. 178).  Gaddis refused to work with his newly appointed attorney and stated many attorneys are part of the criminal element of the establishment.  (*Id.*).  Gaddis again accused his first court-appointed attorney of being a pedophile. (*Id.*).  Gaddis stated that only the antiestablishment group that he worked for could represent him. (*Id.*).  When the Court expressed concern that Gaddis might kill someone on the streets that he believes to be child molester, Gaddis responded:

> Any legitime man who walks the streets and runs into a child molester might kill him if they are a man of dignity and honor and respect and look after children, which we all should be.  Shouldn't anybody who sees a child molester say, "hey, he needs to be exterminated from this world?"  They are what I call worms. A person who would abuse a child physically, sexually, morally, or emotionally.  Any man with any honor and integrity would think about killing a child molester.  Yes.  Am I going to do it?  Who knows?

(*Id.*).

Actual sex offenders, however, are not the only ones at risk. Gaddis' delusions about sex offenders have extended to Publix executive and court-appointed attorneys. Gaddis now believes that ordinary members of society (*i.e.*, the "establishment") are in a "consciously delusional state" where they have been tricked into committing sexual assaults on individuals whom they were told were not real. In Gaddis' mind, these members of society are responsible for these "heinous acts." As Gaddis explained at the hearing:

> So whether each of you are part of the criminal sector of the establishment, I don't know. Are all of you part of the establishment? Of course. Did you go through something to get in it? Yes. Did you go through some type of initiation that's probably a humiliating act of some kind? Yes, all of you did. I guarantee you did. Would you admit it? No. This goes back to the pure evil we are dealing with. We're talking about Publix and what myself and a group have uncovered about Publix and other institutions is disturbing. My competency or lack thereof is irrelevant. What is relevant is justice being served in this Publix case and many other cases where the criminal element of the establishment took what I call a group activity and ran amuck with it. Somebody convinced you to go through such a heinous act on another person and convinced you that that was not a real person. That they convince you— what I call that state is a consciously delusional state. And that you have not mastered your mind that there is no such thing as a non-real person. If someone convinced me to go out and say go murder that person right there cause he is not a real man, and I went and murdered him, then I'm still responsible for what I just did. Even though I was in a consciously delusional state and didn't realize that that was a real person. These are called group activities and they are going on all over our world and the criminal element of the establishment is the source of the problem.

(*Id.*). In other words, any member of the public who encounters Gaddis is at risk of becoming the subject of his delusions, and Gaddis has made clear that he may very well harm them.

## DISCUSSION

The issue now before the Court is whether Defendant is competent to proceed with his final revocation hearing.  Based on the testimony of Dr. Du Bois and the Court's independent observations of Gaddis at the recent hearings, the Court finds that Gaddis' mental health has deteriorated since his last visit to Butner to the point where Gaddis is experiencing significant delusions about the criminal justice system, the Court, and all court-appointed attorneys which interferes with his rational understanding of the proceedings and ability to assist counsel.  Accordingly, the Court finds by a preponderance of the evidence that Gaddis is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.  18 U.S.C. § 4241(d).  The Court commits Gaddis to the custody of the Attorney General for hospitalization and treatment in a suitable facility. *Id.*

The Court is mindful of the lengthy period of Gaddis' detention, but the options available to the Court are quite limited.[3]  If Gaddis cannot be restored to competency in the foreseeable future, the director of the facility where Gaddis is hospitalized should consider whether Gaddis is "presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another"  such that a certificate of dangerousness should be

---

[3] The Court considered appointing a local forensic psychiatrist to evaluate Gaddis but was unable to find a suitable psychiatrist willing to accept the appointment.  Moreover, Gaddis stated he would not cooperate with such an evaluation.

12

transmitted to the clerk of the court for the district in which the person is confined. 18 U.S.C. § 4246(a).

Accordingly, it is hereby

ORDERED:

1. Gaddis is committed to the custody of the Attorney General.  The Attorney General shall hospitalize Gaddis for treatment in a suitable facility for a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward.

2. In making such a determination, the director of the facility shall determine whether there is a substantial probability that Gaddis' competency can be restored with the involuntary administration of antipsychotic medication.  If so, the director shall provide a comprehensive treatment plan.  In addition, the director shall opine as to whether involuntary medication is appropriate on the ground that Gaddis poses a danger to himself or others.  *See Washington v. Harper*, 494 U.S. 210 (1990).   The director shall further opine, assuming the existence of important government interests, as to whether the (1) involuntary medication will significantly further those concomitant state interests, (2) the involuntary medication is "necessary" to further the important interests, and (3) that the administration of the medication is "medically appropriate, *i.e.*, in the patient's best medical interest in light of his medical condition."  *Sell v. United States*, 539 U.S. 166, 180 (2003).

13

3. If at any time the director of the facility in which Gaddis is hospitalized determines that he has attained the capacity to permit the proceedings to go forward or that there is not a substantial probability that Gaddis will attain such capacity within the foreseeable future, the director shall promptly file a certificate to that effect with the Clerk of the Court.

4. If it is determined that Gaddis' mental condition has not so improved as to permit the proceedings to go forward, the director shall determine whether to certify that Gaddis is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, and that suitable arrangements for State custody and care of the person are not available. If so, the director shall transmit the certificate to the clerk of the court for the district in which Gaddis is confined. 18 U.S.C. § 4246(a).

**ORDERED** in Tampa, Florida on June 22, 2022.

SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE